357 A.2d 142
**In re ESTATE of George A. SEDMAK, a/k/a Alexander Sedmak and Alexander G. Sedmak.**
**Appeal of Zella PORTENAR.**

Supreme Court of Pennsylvania.
Argued April 2, 1976.
Decided May 12, 1976.

M. Paul Smith, Norristown, for appellant.

Charles K. Plotnick, King of Prussia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION

JONES, Chief Justice.

Alexander G. Sedmak died on January 16, 1974. Thereafter, Letters of Administration were granted to one of his brothers, Milano Sedmak. In pursuance of his duties, the Administrator discovered among the decedent's papers, a handwritten document addressed to him.[1] At the request of counsel for appellant, the writing was submitted to the Register of Wills of Montgomery County for probate. The writing so offered reads as follows:

"My Brother Mil                                        Oct. 6–72

Please see that Zella Portenar receives $5000 from my Savings account it is in the Western Saving Bank [sic]

George A. Sedmak
or Alexander Sedmak"

The matter was certified to the Orphans' Court Division, Court of Common Pleas of Montgomery County, under Section 907 of the Probate, Estates and Fiduciaries Code [Act of June 30, 1972, P.L. 508, No. 164, § 2, 20 P. S. § 907, *eff.* July 1, 1972]. This is an appeal from the Orphans' Court's final decree, dated May 21, 1975, refusing to admit to probate this document, which all parties agree was written and signed by the decedent.[2]

Appellant, Zella Portenar, urges that the court below erred in concluding that the submitted document, together with extrinsic evidence made part of the record, evidences no more than an intent to make an actual, presently effective gift. After a careful review of the rec-

1. It should be noted that the lower court found that the fact that the writing was addressed to the same brother later appointed Administrator upon motion of the next-of-kin was purely coincidental.

2. Jurisdiction is founded upon the Act of July 31, 1970, P.L. 673, No. 223, Art. II; 202(3). 17 P.S. 211.202(3) (1975–1976 Supp.).

ord, we are of the opinion that the facts of this case warrant the reversal of the decree of the court below, based upon our conclusion that the document in question, under the circumstances, demonstrates testamentary intent.

The record reveals that the decedent and appellant were very close friends for over forty years. At one time, the two contemplated marriage but appellant decided against such a union because the decedent was given to the vice of gambling. Decedent was a painting contractor. Appellant worked until retirement as a bookkeeper. Every Sunday and on family holidays, the decedent came to dinner at appellant and her sister's home. He was in fact expected to dinner the Sunday night he died.

Three separate savings account books were entered into evidence, each in the sole name of the appellant, Zella Portenar, and each marked "Special Account".[3] In addition, the appellant's will, made out in 1969, was marked as an exhibit. One of the provisions in that will recites that the entire savings in those three accounts belong to the decedent. Appellant testified that over the years, she was entrusted with a certain portion of the decedent's earnings from each of his painting jobs, and as part of this "forced savings" plan, to ensure decedent's financial security in his old age, she or her sister deposited the funds in these interest-bearing accounts.[4] The appellant's sister testified to the same effect. The monies saved were always acknowledged to belong to the decedent and he gratefully acquiesced in these arrangements.

3. Aside from this, a few very small accounts in decedent's name were in existence; however, this fact is inconsequential to our inquiry.

4. The testimony further established that the appellant paid from her own funds income tax on the earnings of the three savings accounts.

From the evidence offered by appellant, it was established that one of these accounts was with the Western Savings Bank and further, that as of October 6, 1972, this account held $6,774.05.[5] *The decedent on that date had no account in his own name with that Bank.* Additionally, appellant and her sister both testified that the deposit books for these accounts were at all times kept in a safe deposit box in the name of the two sisters jointly.

The testimony further established that over the latter months of decedent's life, appellant increasingly expressed her fear that if she died first, her 1969 will might not be legally sufficient to avoid decedent's having to pay inheritance tax on his own money and for that reason, it might be prudent to transfer the monies in these three accounts to decedent's name. On February 14, 1973, decedent and appellant went to the three banks and closed out the accounts. The Western Savings Bank account held $6,814.89 on that date. A $5,000 savings certificate was purchased in the name of decedent and a personal savings account was opened with a deposit of $1,814.89.

It should also be noted that the date appearing on the document offered for probate, October 6, is appellant's birth date. Lastly, the record establishes that Zella Portenar was unaware of the existence of the writing in question until after decedent's death.

The following are well-settled principles established by our case law which the lower court properly recognized:

"A writing need not assume any particular form or be couched in language technically appropriate to its testamentary character to take effect as a will or a codicil. If the instrument is in writing and signed

5. Additionally, a second account at the Philadelphia Saving Fund Society in Zella Portenar's name reflected a balance of $2,689.82 as of October 6, 1972. A third account at the Beneficial Mutual Savings Bank, also in appellant's name, reflected a balance of $2,812.97 on that date. Both accounts, along with the Western Savings Bank account, were closed on February 14, 1973.

by the decedent at the end thereof and is an otherwise legal declaration of his intention which he wills to be performed after his death, it must be given effect as a will or codicil, as the case may be: see *Zell's Estate,* 329 Pa. 312, at page 314, 198 A. 76, and cases there collected."

*Hengen Estate,* 337 Pa. 547, 549, 12 A.2d 119, 120 (1940). Furthermore,

"Where a writing by its terms clearly constitutes a testamentary disposition, evidence of a contrary intent is inadmissible: *Lillibridge's Estate,* 221 Pa. 5, 69 A. 1121; *Gibson's Estate,* 128 Pa.Super. 44, 193 A. 302. Conversely, where a writing is obviously *not* a will, evidence of testamentary intent is not admissible. *McCune's Estate,* 265 Pa. 523, 109 A. 156; *O'Conner's Estate,* 273 Pa. 391, 117 A. 61. Where, however, such intent is doubtful or equivocal, extrinsic evidence *is* admissible: *O'Conner's Estate,* supra; *Smith's Estate,* 308 Pa. 265, 162 A. 214; *McKean Estate,* 159 Pa. Super. 409, 48 A.2d 74."

*Thompson Will,* 375 Pa. 193, 197, 100 A.2d 69, 71 (1953).

■ The court below correctly determined that the writing offered was indeed ambiguous in that on its face it disposes of ascertained property to an identifiable recipient yet it is not couched in language such as to relate it to the event or circumstance of decedent's death. Therefore, it was appropriate for the lower court to look at the extrinsic evidence offered to determine whether or not the decedent wrote these directions to his brother Mil with the intention that the gift of $5,000 be given Ms. Portenar in the event that he predeceased her.[6]

6. The record discloses that an objection was made on behalf of decedent's estate to the testimony by appellant herself on the grounds of her incompetency to so testify in support of her position under the Dead Man's Act. An exception was also taken to the testimony of appellant's sister; however, the basis of that objection was that the writing spoke for itself and therefore extrinsic evidence should not have been admitted. The three bank

The court's final decree refusing to admit the holographic paper to probate relied upon our case law gleaning testamentary intent from an informal document,

(1) reciting phrases such as "when I die," "In case of my death . . ." ". . . immediately upon my death, . . ." or "If anything happens to me . . ." [*See Thompson Will*, 375 Pa. 193, 100 A.2d 69 (1953); *Wenz's Estate*, 345 Pa. 393, 29 A.2d 13 (1942); *Zell's Estate*, 329 Pa. 312, 198 A. 76 (1938); *Kling Estate*, 12 Pa.D.C.2d 588 (1956)]; or,

(2) one written at a time when the scrivener was either seriously ill or knew of imminent death [*See Kauffman Will*, 365 Pa. 555, 76 A.2d 414 (1950); *McKean Estate*, 159 Pa.Super. 409, 48 A.2d 74 (1946)]; or,

(3) an informal document found in a certain location that in and of itself clearly suggests that the scrivener desired its discovery only after death [*See Hengen's Estate*, 337 Pa. 547, 12 A.2d 119 (1940); *Tozer v. Jackson*, 164 Pa. 373, 30 A. 400 (1894); *McKean Estate, supra*].

■ Often, any combination of the above or a situation involving all three facts has led the courts to a finding that at the time of the writing, the scrivener was contemplating the event of death. Nevertheless, a valid holographic will can be found where the extrinsic evidence otherwise supports the conclusion that the writer

account books referred to previously were entered as exhibits without objection and appellant's 1969 will was admitted over objection on grounds of relevancy. The lower court opinion considered Zella Portenar's testimony along with the other supporting extrinsic evidence presented stating: "Without specifically determining that the testimony of Zella Portenar is admissible, we have nevertheless considered it in reaching our decision [that the writing is not testamentary], since it is insufficient in any event to allow probate of the writing in question." (*Estate of George A. Sedmak* (a/k/a Alexander Sedmak and Alexander G. Sedmak), Deceased, Opinion and Order, No. 76,038, at p. 2 [Montgomery County C. P., Orphans' Court Division, May 21, 1975]).

This Court, on the other hand, reaches the opposite result as to the testamentary character of the writing in question. Moreover, we believe that such a conclusion is supported on the record, exclusive of Zella Portenar's testimony.

intended that the paper should take effect only after death.

The extrinsic evidence presented in the instant case, when viewed in conjunction with the writing itself, supports the conclusion that the decedent was contemplating the possibility of his predeceasing appellant at the time that he wrote out the holographic paper in question. As of October 6, 1972, the decedent knew that he had no funds in his own name at the Western Savings Bank. He knew in fact that his earnings were held in the name of the very person designated in the writing to receive $5,000. Why did he not simply tell Ms. Portenar to withdraw that amount of money for herself if indeed his intention was to give her a very generous present on the occasion of her birthday? Why did he write out the instructions to a third party, his brother, who had no present authority or ability to carry out the directions and then keep the document with his other papers, unless it was for the purpose of informing a member of his family of the testamentary wish? *See Hengen's Estate, supra,* wherein this Court quoted with approval from the case of *Cock v. Cooke,* P.Rep. 1 Prob. and Div. 241:

> "The expression, 'I wish my sister to have [my Schering (Charing) Cross bank book for her own use],' appears . . . to imply, 'I wish her to have after my death', because when she wrote those words she was dangerously ill and did not expect to live, and *if she had merely wished to make her sister a present she would not have taken the trouble to write anything at all, but would simply have handed the bank book over to her."*

337 Pa. at 550, 12 A.2d at 120 (Emphasis added).

Furthermore, the long and close relationship existent between the decedent and appellant, one in which decedent regularly courted Ms. Portenar for over forty years, sharing holiday occasions and weekly Sunday dinners up

until the time of his death, is consistent with a finding of testamentary intent. Although the decedent was extremely secretive about his financial affairs with all of his associates including his blood-relations, his demonstrated confidence and trust in Ms. Portenar, who set up and maintained in her name a savings program to ensure his future financial security, was amply reflected in the record. [*See Thompson Will*, 375 Pa. 193, 198, 100 A.2d 69, 72 (1953), wherein this Court recognized as one factor the close relationship between the decedent and his niece, the appellee, in answering the question of whether or not the decedent *intended* that an informal letter addressed to her be testamentary.]

Lastly, we find the lower court's holding that this writing was intended as an inter vivos gift difficult to reconcile with the uncontradicted extrinsic evidence presented concerning the purpose behind the decedent's savings program. Why would the decedent give Ms. Portenar a sum exceeding one-third of his accumulated savings put aside to ensure his financial security for the latter part of his life at a time when indeed he was reaching that very stage?

We conclude that Alexander Sedmak, in writing the October 6 holographic paper, intended a testamentary gift to be given Ms. Portenar only in the event that he predeceased her. Accordingly, the decree of the court below is reversed and the matter remanded for further proceedings consistent with this opinion.

Both parties to bear own costs.