## Schafitz Will

Donald R. McKay, for petitioner, Hazel Bowie.

Timothy F. Burke, for Leonard Shafer.

Charles S. Hersh, for estate.

OPINION BY ACKER, J., SEPT. 16, 1980:

This matter comes before this court upon a petition to certify the entire record to this court for the determination of whether a writing upon an envelope is a codicil to the last will and testament of the testator. Testimony was taken through

deposition and before the court from which this court makes the following findings of fact:

Findings of Fact

(1) Sanford A. Schafitz died in Sharon General hospital on May 30, 1979, aged 53.

(2) The decedent was survived by a brother, Leonard J. Schafitz, also known as Leonard Shafer, of Fort Lauderdale, Florida, a sister, Dorothy Beerstein, of North Ridge, California, and a sister, Ethel Burns, of Oak Park, Michigan.

(3) The decedent resided at 779 Maple Drive, Hermitage Township, Mercer County, Pennsylvania, and was the owner of radio station WFAR, which is located in Mercer County.

(4) On December 30, 1977, the decedent executed a will which has been admitted to probate. Under this will, decedent's brother, Leonard J. Schafitz, received fifty percent of his estate, his sister, Dorothy Beerstein, forty-five percent of the estate, and Albert Zippay, a trusted employee of 25 years at WFAR, five percent of his estate. Zippay was also named executor.

(5) Decedent's total estate, as taken from the inventory, is in the approximate amount of $915,000.

(6) The decedent first met Hazel Bowie, the petitioner, in late 1973 or early 1974. As the years progressed and especially after petitioner's divorce in 1977, they became closer.

(7) The petitioner, Hazel Bowie, has a child, Sheryl. Because of the unusual needs of the child it has affected the type of relationship which existed between the petitioner and the decedent.

(8) The decedent, however, felt a very close relationship with the petitioner as evidenced by a number of items of personal property and monies which were given by him to her during the course of their relationship. Those items included a refrigerator, stove, stereo, bicycle, utilities for the kitchen, jewelry, fragrances, cologne, expensive perfumes, boots, lingerie and gifts of $100 in cash at various times.

(9) Decedent told the petitioner that she was closer to him than his own family, for his family members would call upon him only when they had problems or needed help.

(10) In the six months preceding his death, the decedent

saw the petitioner two or three times per week and called her quite often by telephone, sometimes two or three times a day. The decedent expressed to the petitioner, "I could never really give you enough for what you've done for me."

(11) The petitioner purchased a house on Jefferson Avenue in the City of Sharon with the decedent acting as a "sort of an advisor."

(12) Although the decedent talked of giving things to the petitioner in his will he had not actually named her in any will prior to the codicil which is the subject of this matter.

(13) The petitioner fixed the decedent's clothes, cleaned his house, ran his errands and helped him with the business.

(14) On May 25, 1979, at 5:00 or 5:30 o'clock, p.m., decedent, without any indication of illness, called the manager of his station, Zippay, and talked about business matters.

(15) On May 25, 1979, around 9:15 p.m., the decedent called Hazel Bowie, telling her, "I'm not feeling too well. I was going to call the ambulance but I prefer if you would take me to the hospital." Mrs. Bowie arrived at his home at about 9:25 p.m. and had him at the hospital at around 9:30 p.m. The decedent complained of a condition like indigestion. He was able to talk and stand but the attendants wanted him to get into bed. The testator was not excited. He could not understand why whatever was happening to him was occurring.

(16) Mrs. Bowie attempted to coax the decedent to lie on a cot and remained with him and talked to him until he was taken upstairs from the emergency room.

(17) The decedent insisted that he talk to his manager, Zippay, by telephone and that he wanted to write. Eventually the cot on which he was seated was pulled into the hallway next to the nurse's counter, where he would have access to the phone.

(18) At about 9:30 o'clock, p.m., the decedent did call the station manager, Zippay, and informed him that he had been admitted to the hospital with a heart attack, that he wanted to get out of the business and that he was trying to contact his brother. He told Zippay that he was the executor of his estate. Zippay had been informed of this by the testator on previous occasions. He told Zippay that he, Zippay, was in the

will for a small portion, that his brother was his chief heir, and that he wished Zippay to sell the station in an orderly manner.

(19) Zippay subsequently called back to the nurse in the hospital to inform the decedent that he had found that the brother, Leonard, had changed his last name to Shafer, and was being traced down and that the police were going to his home to notify him.

(20) Following the first call to Zippay, the decedent stated to those about him that he wanted to talk to Mr. Zippay. Turning to Mrs. Bowie he stated, "I want to give you some money. I'm a wealthy man and I want to give you something." Mrs. Bowie kept informing him that he was going to be all right and to let them get him better. The decedent insisted he wanted to see this taken care of and insisted that he be given paper and pen. He wanted that to occur immediately.

(21) The first phone call to Zippay was made prior to the writing. The call was made at the nurse's station after the decedent had been wheeled on a cot to the phone which was placed on the counter. After making the phone call, the decedent asked for the paper and something to write with.

(22) The decedent said to Mrs. Bowie, "I want you to get me out in the hall. I want a paper and pen. I want to write. Get me a piece of paper." The decedent wanted everybody to move at his command and to do what he wanted.

(23) The decedent asked Mrs. Bowie if she did not have something in her pocketbook that he could write on, to which she responded, "Yes, I have this little envelope." The decedent responded, "Well, here." The nurse apparently furnished the pen. Decedent was not excited but was insistent.

(24) Following the receipt of petitioner's paper, decedent wrote that which is in controversy as a proposed codicil. It reads,

"MAY 25
79
TO A
ZIPPAY
BE SURE
YOU GIVE
HAZEL BOWIE
$10,000.00

S. Schafitz

TEN THOUSAND"

(25) After writing, the decedent turned to Mrs. Bowie and gave her the envelope saying, "You be sure to keep this. I want this carried out."

(26) In addition, the decedent wanted those present to witness him sign the writing, saying, "You saw me do this and you heard me make this call."

(27) Subsequently, Zippay received a phone call from a nurse at the hospital stating that the decedent told him to call him with the news that Hazel had the note indicating she was to receive some money ". . . and that I was to see that the money was turned in to the attorney."

Upon these facts, this matter must be determined.

## Discussion

The parties, through their attorneys at the outset, stipulated that the "Dead Man's Act"[1] was not to be used by either side to bar the testimony of any of the witnesses.

If a writing is ambiguous on its face in that it disposes of property to an identified recipient yet is not couched in language that indicates that donor's intent that the gift take effect after death, extrinsic evidence may be admitted in order to determine whether the necessary testamentary intent was present at the time the writing was made. *Estate of Ritchie*, 480 Pa. 57; *Estate of Sedmak*, 467 Pa. 379; *Kauffman Will*, 365 Pa. 555.[2]

Therefore, the issue is whether the writing, when viewed in conjunction with extrinsic evidence, indicates that the gift described in the writing was to take effect after the death of the testator. It must be acknowledged that the writing which is the subject of this case contains no language that is testamentary in nature such as "when I die", "upon my death" or "if anything happens to me'" The absence of such language, however, is not a final determiner: *Estate of Ritchie, supra.* Testamentary intent may at least in part be found in examin-

---

1. Act of 1976, July 9, P.L. 586, No. 142, Section 2 [42 Pa. C. S. A. 5930].

2. The respondent, Leonard Shafer, in this case does not by either oral argument or brief contest this to be a proper case for the receipt of extrinsic evidence, thereby acknowledging that there is sufficient ambiguity to warrant the issue to be so viewed.

ing the place where testator intended the paper to be held, so that it may be reasonably assumed that it will be discovered after the testator's death: *Hengen's Est.*, 337 Pa. 547. If the testator was either seriously ill or knew of imminent death, the writing may be regarded as testamentary: *Estate of Sedmak*, supra; *Kauffman Will*, supra. In *Hengen's Estate*, supra, the following was found to be a valid codicil to a will: "I want Mamie to have my house 544 George St. M. L. Henge." *Sedmak* relies upon *Cock vs. Cooke*, L. Rep. 1 Prob. and Div. 241, where the following language was held to be testamentary: "I wish my sister, Louisa Cook of 104 York Road, Lambeth, to have My Schering (Charing) Cross bank book for her own use. Sarah Jenkins."

In the *Estate of Sedmak*, supra, testator prior to his death directed his brother to see that a named recipient receive $5,000 from a savings account. This was held to be ambiguous on its face, so the court permitted evidence of the circumstances of decedent's death in order to determine whether the directions to the brother were with the intention that the gift be testamentary. In that case, a valid holograph will was found where extrinsic evidence supports conclusions that the writer intended the paper as a testamentary writing. In *Sedmak*, the relationship of the parties was very close for over 40 years. Although marriage was contemplated, the union was not accomplished because of decedent's gambling habit. The decedent, as in the instant case, trusted the female companion by permitting her to invest monies from his painting contract jobs in bank accounts for his old age. Citing *Hengen's Est.*, 337 Pa. 547, 549, the court declares the following to be well settled principles.

> "A writing need not assume any particular form or be couched in language technically appropriate to its testamentary character to take effect as a will or a codicil. If the instrument is in writing and signed by the decedent at the end thereof and is an otherwise legal declaration of his intention which he wills to be performed after his death, it must be given effect as a will or codicil, as the case may be." (Citation omitted).

As found in *Hengen's Estate*, supra, the testamentary disposition can be made even though the instrument or paper does not have the words "after my death." This can be sup-

plied by the surrounding circumstances at the time of the execution of the instrument.

When considering the circumstances of Sanford A. Schafitz at the time of the preparation and execution of the paper involved in this case we find the decedent had previously been hospitalized, that he was brought into the hospital and required by the hospital attendants to remain on a cot despite his very decided desire to obtain a piece of paper and a pen to write the instrument involved in this case. He was so insistent that he required the attendants to wheel him out into the hall from the room in which he was being attended so that he could reach a telephone at the nurse's counter and call the executor of his estate to be certain that he knew that monies were to be provided for Hazel Bowie, his close and dear friend. He desired that those persons from the hospital present know that he made such a phone call and insisted on writing the paper involved in this case. He would not permit himself to be taken upstairs for further treatment until he had completed the task. He died five days after he wrote the instructions to his executor. There can be no question that he was in full possession of his faculties and was under no undue influence at the time that he executed the paper. There is no contention to the contrary.

. The decedent was very insistent that the instructions on the envelope be carried out. He wanted the beneficiary of his efforts to be certain to receive the monies by insisting that she keep the envelope upon which he had written the instructions. That decedent directed a nurse to call the executor on the night decedent was admitted to the hospital in order to pass on further instructions from the decedent is of particular significance. First, through the nurse, decedent informed the executor that Hazel Bowie had the note indicating she was to receive some money, but second he wanted the executor to see that the money was turned in to the attorney. If the testator was merely making a gift at that time, which conceivably could be made by Zippay as manager of the radio station, there would appear to be no reason to instruct him that the money was to be turned in to the attorney, for it is common knowledge that attorneys assist executors in the management of estates. There

can be no question the decedent very much desired that Hazel Bowie receive $10,000. To permit the acceptance for probate by the register of wills of the codicil consisting of the note on the envelope is exactly what the decedent wished to be accomplished.

Wherefore, an appropriate order is entered granting the prayer of the petition to require the Register of Wills of Mercer County to accept for probate the instrument, a photocopy of which is attached to the petition to probate, as Exhibit "A".

## Frick Estate

Before Taxis and Tredinnick, JJ.

Jerome C. Groskin, for accountants.

Catherine R. Barone, for Commonwealth.

OPINION BY TREDINNICK, J., FEBRUARY 13, 1981:

This court's supplemental adjudication of February 1, 1978, approved accountants' inheritance tax deductions of approximately $99,000 because the Commonwealth was represented at audit and did not object to the deductions. The Commonwealth filed exceptions to that adjudication. The exceptions were dismissed on the basis that no "written objections" to the account had been filed by the Commonwealth.